LINK: 40

FILED
CLERK, U S DISTRICT COURT

FEB -7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

JOHN ALBA, an individual; SERJIK
ELYSIAN, an individual; individually
and on behalf of all other similarly
situated current and former employees,

            Plaintiffs,

    v.

PAPA JOHN'S USA, INC., dba PJ
USA, INC., a Kentucky Corporation; PJ
UNITED, INC. a Delaware Corporation;
PJ CHEESE, INC., an Alabama
Corporation; and DOES 1-10,

            Defendants.

**Case No. CV 05-7487 GAF (CTx)**

**MEMORANDUM AND ORDER
REGARDING PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**



DOCKETED ON CM

FEB - 8 2007

BY                    010

## I.

## INTRODUCTION AND SUMMARY

Defendant PJ United and its wholly-owned subsidiary, PJ Cheese, operated

14 Papa John's pizza restaurants in Los Angeles County from 2001 to 2005.  During

that period Plaintiff John Alba worked in a Papa John's restaurant first as an assistant

manager and later as a General Manager until his termination in 2005.  During nearly

1   the same period, Plaintiff Serjik Elysian worked as a delivery driver.  Representing two

2   subclasses of employees, Plaintiffs bring this class action lawsuit in which they claim

3   that, during the period from 2001 to 2005: (1)  defendants improperly classified the

4   General Managers (referenced as "store managers") as exempt, thus depriving them

5   of their meal breaks, rest periods, and overtime pay under California law; and (2)

6   defendants improperly denied its driver and other in-store employees their right to

7   meal and rest periods under California law.

8        Plaintiffs now move for certification of the two subclasses and for appointment

9   of their attorneys as class counsel.  Defendants oppose the motion on a number of

10   grounds, but with particular emphasis on their contention that individual issues

11   predominate over common issues with respect to both classes.  Defendants also

12   contend that Plaintiffs are not adequate class representatives and also contend that

13   the class of store managers, which includes 44 different store managers, fails the

14   numerosity test.

15   **A. STORE MANAGERS**

16        The Court finds the opposition unpersuasive.  The record before the Court

17   reveals the existence of common issues of fact and law applicable to all class

18   members regarding violations of their rights under California's wage and hour law,

19   and further demonstrates that the named plaintiffs present claims typical of those

20   common to the class.  Even though the store manager subclass contains only 44

21   members, Ninth Circuit case law supports a finding of numerosity as to the store

22   manager subclass.  See Jordan v. Los Angeles County, 669 F.2d 1311, 1319 (9th

23   Cir. 1982), vacated on other grounds by 459 U.S. 810 (1982) (in considering the

24   certification of three proposed subclasses, the court noted that it "would be inclined to

25   find the numerosity requirement in the present case satisfied solely on the basis of

26   the number of ascertained class members, i.e., 39, 64, and 71").

27   //

28   //

1   The principal issue then is whether these common questions of law and fact

2   "predominate" over individual questions, making a class action a superior method for

3   fairly and efficiently adjudicating this controversy.  Defendants now contend that the

4   exempt/non-exempt status of members of the store manager class must be

5   determined on a case-by-case basis, and that Plaintiffs may not assert, as a group,

6   that store managers were non-exempt employees.  To make that argument,

7   Defendants ignore that they took the opposite position in their treatment of the store

8   managers, that is, declaring, as a matter of corporate policy, that all store managers

9   were exempt from the California wage and hour law requirements regarding breaks

10   and overtime pay.  Defendants also initially ignored, and now attempt to downplay,

11   the impact of their written, company-wide policy effectively stripping the store

12   managers of discretionary authority in the performance of their duties.  Defendants'

13   policies place the case within the scope of the court's analysis in Tierno v. Rite Aid

14   Corp., No. C 05-02520 TEH, 2006 WL 253056 (N.D. Cal. Aug. 31, 2006), where

15   common questions of law and fact were found to predominate in large part because

16   of the presence of standardized practices enforced from a central authority, and

17   outside the holding in Jimenez v. Domino's Pizza, 238 F.R.D. 241 (C.D. Cal. 2006),

18   where no standardized procedures had been put in place, thereby undermining the

19   plaintiff's claim that common questions predominated.

20   **B. DELIVERY DRIVERS AND OTHER IN-STORE EMPLOYEES**

21   Because Defendants concede that the delivery driver and in-store employee

22   subclass, which includes at least 900 members, meets the numerosity requirement,

23   the critical issues involve the typicality of the driver's claims and their predominance

24   over individual questions.  The evidence before the Court establishes that Defendants

25   issued a written policy that, on its face, conflicts with California law.  And although

26   Defendants contend that the policy was applied differently in California, and in

27   accordance with California wage and hour law, that contention goes to the merits of

28   the dispute and not to the question of whether common issues predominate, which is

3

1   the critical question on a motion for certification.   <u>Eisen v. Carlisle & Jacquelin</u>, 417

2   U.S. 156, 177-78 (1974); <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 954 (9th Cir. 2003).

3          Accordingly, as the Court sets forth in greater detail below, the motion to

4   certify the two subclasses is **GRANTED** and Plaintiffs' counsel is appointed as class

5   counsel in this case.

6                                              II.

7                               **STATEMENT OF FACTS**

8   A. THE PARTIES

9          PJ Cheese is a wholly-owned subsidiary of PJ United.  (Green Decl. ¶ 1.)  PJ

10  Cheese owned and operated 14 Papa John's pizza restaurants in southern California

11  from August 25, 2001 until May 25, 2005, when it sold the restaurants to another

12  entity – PJ Elite.  (<u>Id.</u>; Williams Decl. ¶ 1.)

13         Plaintiff John Alba was employed by Defendants from 2001 to 2005.  (Alba

14  Decl. ¶ 2.)  In early 2001, he was initially hired as an assistant manager, and several

15  months later, he was promoted to the position of General Manager, a position he held

16  until he was terminated in March 2005 for performance reasons.  (<u>Id.</u>; Green Decl. ¶

17  6.)  Plaintiff Serjik Elysian was employed by Defendants as a delivery driver from

18  February 2001 to May 2005, when he was terminated for excessive customer

19  complaints.  (Elysian Decl. ¶ 2; Green Decl. ¶ 7.)

20  B. DEFENDANTS' POLICIES AND PRACTICES

21         1. STANDARDIZED POLICIES AND PRACTICES

22         During the class period, Defendants classified all store managers as exempt.

23  (Khorrami Decl., Ex. B [Response to Interrogatory No. 3].)

24         Throughout their California restaurants, Defendants used standardized

25  policies and practices.  These policies included a hierarchical management structure,

26  where area supervisors would regularly oversee the operation of each restaurant.

27  (Alba Decl. ¶ 11; Byrd Decl. ¶ 11; Jalal Decl. ¶ 11; Lester Decl. ¶ 11; Olamiti Decl. ¶

28  11.)  Store managers, employees hired to manage individual restaurants (Williams

                                              4

1   Decl., Ex. 1 [General Manager Job Description]) were required to print out "daily

2   reports" of their restaurants' business activities for their area supervisors to review.

3   (Alba Decl. ¶ 11; Byrd Decl. ¶ 11; Jalal Decl. ¶ 11; Lester Decl. ¶ 11; Olamiti Decl. ¶

4   11.)

5          In addition, Defendants employed a standardized Operations Manual for all of

6   their California stores. (Khorrami Decl., Ex. C [Request for Admissions No. 8].)  This

7   manual covered all aspects of running a Papa John's restaurant, such as opening

8   and closing, food preparation, order taking, delivery procedures, and team member

9   development. (Id., Ex. F [Operations Manual Table of Contents].)  Page 1 of the

10  manual displayed a "Manager's Daily Operations Guide Checklist," which listed

11  various tasks that a manager should ensure were accomplished daily. (Khorrami

12  Decl., Ex. H [Daily Checklist].)  These tasks involved all aspects of running the

13  restaurant: opening the restaurant, performing on-going operational tasks, handling

14  shift changes, dinner rush, and closing. (Id.)  The Operations Manual also described

15  a "deployment" policy, which governed employees' duties based on the number of

16  employees working at the time. (Id., Ex. G [Deployment Section].)  Specifically, the

17  manual provided that "[t]here are several hours during an operational day when

18  projected products require only one in-store team member.  During this time, the

19  manager in charge is the in-store team." (Id.)  To ensure that these procedures were

20  followed, Defendants used a standardized training program for all their employees in

21  their California stores. (Khorrami Decl., Ex. C [Requests for Admissions Nos. 4-7.)

22         Centralized control over financial aspects of store operation was maintained

23  through a computer system installed at each store called the "Profit System," which

24  helped facilitate cash management, inventory control, profit and loss reporting, quality

25  assurance, and labor management. (Id., Ex. I [Profit System Section] at 74-75.)  The

26  Profit System's purpose was "to make management easier, while increasing the

27  efficiency of restaurant operations." (Id. at 74.)  This system was central to the

28  operation of the business, as it recorded pizza orders, managed inventory, and

5

1   recorded every financial event in a store's operation.  (Khorrami Decl., Ex. I [Profit

2   System] at 74-75; Alba Decl. ¶ 9; Byrd Decl. ¶ 9; Jalal Decl. ¶ 9; Lester Decl. ¶ 9;

3   Olamiti Decl. ¶ 9.)

4        Defendants also employed a "strict labor goal" policy, which limited the cost of

5   labor to the minimum necessary to operate each store.  (Alba Decl. ¶ 5; Byrd Decl. ¶

6   5; Jalal Decl. ¶ 5; Lester Decl. ¶ 5; Olamiti Decl. ¶ 5; see Kerr Decl. ¶ 9.)  The Director

7   of Operations implemented the policy, which required that each store manager submit

8   the employee schedule weekly to his or her area supervisor to ensure that the labor

9   goals were met.  (Alba Decl. ¶ 5; Byrd Decl. ¶ 5; Jalal Decl. ¶ 5; Lester Decl. ¶ 5;

10  Olamiti Decl. ¶ 5.)

11       **2. MEAL AND REST BREAK POLICY**

12       Defendants' Team Member Handbook, which was given to all their non-

13  exempt hourly employees, outlined Defendants' policy with regard to meal and rest

14  breaks.  It provided:

15           Unless otherwise required by state or county laws, team members who
             work eight or more hours in a single shift are entitled to a 30-minute
16           unpaid meal break near the middle of that shift.  Team members
             working more than four hours may take a paid 10-minute break, as
17           work allows, in the morning and in the afternoon.

18  (Khorrami Decl., Ex. E [Team Member Handbook] at 46.)  Defendants admit that this

19  meal and rest period policy was the policy communicated to all their California

20  employees during the class period.  (Khorrami Decl., Ex. C [Responses to Requests

21  for Admission Nos. 9-10.)

22  **C. PLAINTIFFS' CLAIMS**

23       In their Complaint, Plaintiffs allege that Defendants employed policies and

24  practices designed to evade the requirement of paying store managers' overtime

25  compensation, and providing all employees meal and rest breaks required under

26  California law.  Specifically, Plaintiffs allege: (1) failure to pay overtime compensation

27  in violation of California Labor Code § 510; (2) failure to provide rest periods in

28  violation of Cal. Code Regs. tit. 8, § 11070; (3) failure to provide meal periods in

1  violation of Cal. Code Regs. tit. 8, § 11070; and (4) unlawful, deceptive, and/or unfair

2  business practices in violation of California Business and Professions Code § 17200

3  et seq.  (Compl. ¶¶ 24-47.)

4  　　　As to claims applicable to store managers, Plaintiffs allege that Defendants

5  mis-classified store managers as "exempt" employees, which would mean they were

6  not eligible for overtime compensation and meal and rest break periods.  As to claims

7  applicable to non-exempt hourly employees, Plaintiffs contend that Defendants' meal

8  and rest break policies violated California law on their face.

9  　　　Now, Plaintiffs move for certification of two subclasses to differentiate

10  between store managers and non-exempt hourly employees:

11  　　**SUBCLASS A:** All general managers of Papa John's restaurants
　　owned by PJ Cheese, Inc. and/or PJ United, Inc., throughout the State
12  　　of California who were classified as exempt employees between
　　August 25, 2001 and May 25, 2005, and were not paid overtime
13  　　compensation and/or given rest or meal periods.

14  　　**SUBCLASS B:** All employees of Papa John's restaurants owned by PJ
　　Cheese, Inc. and/or PJ United, Inc., throughout the State of California
15  　　who were classified as non-exempt employees between August 25,
　　2001 and May 25, 2005, and were not provided rest periods and/or
16  　　meal periods as required under California law.

17  　　　　　　　　　　　**III.**

18  　　　　　　　　　　**DISCUSSION**

19  **A. THE APPLICABLE CALIFORNIA LABOR LAWS**

20  　　**1. OVERTIME**

21  　　　The California Labor Code provides that employees are presumptively entitled

22  to be paid overtime for all hours worked in excess of eight hours during a day or forty

23  hours a week, and are entitled to recover unpaid amounts at a rate of at least 1.5

24  times the employee's regular rate of pay.  Cal. Lab. Code § 510(a).

25  　　**2. MEAL AND REST PERIODS**

26  　　　Under California law, "[n]o employer shall employ any person for a work

27  period of more than five (5) hours without a meal period of not less than 30 minutes,

28  except that when a work period of not more than six (6) hours will complete the day's

1   work the meal period may be waived by mutual consent of the employer and the

2   employee." Cal. Code Regs. tit. 8, § 11070(11)(A).  With respect to rest periods,

3   employers are required to provide rest periods for a period of ten minutes for every

4   four hours worked. Id. § 11070(12)(A).

5         3. "EXEMPTION" CLASSIFICATION

6         An employee qualifies for an "executive exemption" from California's overtime

7   and meal and rest period laws if: (1) his duties and responsibilities involve the

8   management of the enterprise in which he or she is employed; (2) he customarily and

9   regularly directs the work of two or more employees; (3) he has the authority to hire or

10   fire other employees; (4) he customarily and regularly exercises discretion and

11   independent judgment; (5) he is primarily engaged in duties that meet the test for

12   exemption; and (6) he earns a monthly salary equivalent to no less than two times the

13   state minimum wage for full-time employment.  Id. § 11070(1)(A)(1).  An employee

14   classified as "exempt" based on all these elements is not covered by California's

15   overtime and meal and rest period laws.  If a classification is challenged, the employer

16   must demonstrate that its "exempt" classification is proper.  Ramirez v. Yosemite

17   Water Co., 20 Cal. 4th 785, 794-95 (1999).

18   **B. CLASS CERTIFICATION**

19         1. THE LEGAL STANDARD

20         Federal Rule of Civil Procedure 23 sets forth the prerequisite requirements for

21   maintaining a class action.  Before certifying a class, the Court must conduct a

22   "rigorous analysis" to ensure that the four requirements of Rule 23(a) are met and that

23   the class fits within one of the three categories of Rule 23(b).  Gen. Tel. Co. of the

24   Sw. v. Falcon, 457 U.S. 147, 161 (1982); Valentino v. Carter-Wallace, Inc., 97 F.3d

25   1227, 1233 (9th Cir. 1996).  The party seeking certification bears the burden of proof

26   with respect to these requirements.  Zinser v. Accufix Research Inst., Inc., 253 F.3d

27   1180, 1186, as amended, 273 F.3d 1266 (9th Cir. 2001).  "Plaintiff can meet this

28   burden by providing the Court with a sufficient basis for forming a 'reasonable

8

1    judgment' on each requirement." Haley v. Medtronic, Inc., 169 F.R.D. 643, 647 (C.D.

2    Cal. 1996) (quoting Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975)).

3        In deciding a motion to certify a class, the court may not evaluate whether the

4    plaintiff is likely to prevail on the merits of the stated claims. Eisen v. Carlisle &

5    Jacquelin, 417 U.S. 156, 177-78 (1974); Staton v. Boeing Co., 327 F.3d 938, 954 (9th

6    Cir. 2003). "[P]laintiff is not required to prove the merits of the class claim on a motion

7    for certification, or even to establish a probability that the action will be successful."

8    Haley, 169 F.R.D. at 647 (citing Eisen, 417 U.S. at 177-78; Valentino, 97 F.3d at

9    1231-32; Blackie, 524 F.2d at 901). However, the court may consider evidence

10   relating to the merits if the evidence also goes to the requirements of Rule 23. Hanon

11   v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

12       **2. THE REQUIREMENTS OF RULE 23(A)**

13       Rule 23(a) requires that: (1) the class be so numerous that joinder of all

14   members is impracticable ("numerosity"); (2) there be questions of law or fact

15   common to the class ("commonality"); (3) the claims or defenses of the representative

16   parties be typical of the claims or defenses of the class ("typicality"); and (4) the

17   representative parties fairly and adequately protect the interests of the class

18   ("adequacy").

19       **a. Numerosity**

20       To establish numerosity, a plaintiff must show that the represented class is so

21   numerous that joinder of all members is impracticable. See Fed. R. Civ. P. 23(a)(1);

22   Bates v. United Parcel Serv., 204 F.R.D. 440, 444 (N.D. Cal. 2001). However,

23   "impracticable" does not mean impossible; it refers only to the difficulty or

24   inconvenience of joining all members of the class. See Harris v. Palm Springs Alpine

25   Estates, Inc., 329 F.2d 909, 913 (9th Cir. 1964); Wang v. Chinese Daily News, Inc.,

26   231 F.R.D. 602, 605 (C.D. Cal. 2005). "Because no exact numerical cut-off exists, the

27   specific facts of each case must be examined to determine if impracticability exists."

28   Haley, 169 F.R.D. at 647 (citing Gen. Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980)).

1  When the class is not so numerous, courts should consider other factors such as "the

2  geographical diversity of class members, the ability of individual claimants to institute

3  separate suits, and whether injunctive or declaratory relief is sought." <u>Jordan v. Los</u>

4  <u>Angeles County</u>, 669 F.2d 1311, 1319 (9th Cir. 1982), <u>vacated on other grounds</u>, 459

5  U.S. 810 (1982).

6        Here, Plaintiffs seek to represent two subclasses: (1) Subclass A which

7  consists of approximately 46 store managers who worked overtime without pay, and

8  who did not receive meal or rest breaks; and (2) Subclass B, which consists of at least

9  900 non-exempt hourly delivery drivers who did not receive meal or rest breaks.

10  Acknowledging that joinder will typically be impracticable for very large classes,

11  <u>Sepulveda v. Wal-Mart Stores, Inc.</u>, 237 F.R.D. 229, 242 (C.D. Cal. 2006),

12  Defendants concede that the delivery driver class meets Rule 23's numerosity

13  requirement.  However, they assert that joinder could be accomplished for Subclass

14  A, since it consists of "only" 46 members, and therefore conclude that it fails the

15  numerosity test.  The argument is simplistic and overlooks pertinent Ninth Circuit

16  authority, which holds that a class consisting of 39 people is large enough to satisfy

17  the numerosity requirement.  <u>Jordan</u>, 669 F.2d at 1319 (in considering the certification

18  of three proposed subclasses, the court noted that it "would be inclined to find the

19  numerosity requirement in the present case satisfied *solely* on the basis of the

20  number of ascertained class members, i.e., 39, 64, and 71") (emphasis added); <u>see</u>

21  <u>also</u> Herbert Newberg & Alba Conte, 1 Newberg on Class Actions, § 3:5 (4th ed.

22  2004) ("the difficulty in joining as few as 40 class members should raise the

23  presumption that joinder is impracticable, and the plaintiff whose class is that large or

24  larger should meet the test of Rule 23(a)(1) on that fact alone").

25        Defendants also argue that joinder is practicable because Plaintiffs have not

26  adequately pled geographic diversity given that all potential class members worked at

27  southern California restaurants.  They also argue that because five store managers

28  individually brought administrative actions before the Labor Commissioner to

1   determine whether they were properly classified as "exempt" employees (see Defs.'
2   Request for Judicial Notice ("RJN") Exs. 1-5 [California Department of Labor Standard
3   Enforcement Complaints and Decisions]), all putative class members are thus
4   capable of bringing individual suits.  However, geographic dispersion and inability to
5   bring individual suits are not requirements to satisfy the numerosity requirement, but
6   rather are merely factors to consider.  See Wang, 231 F.R.D. at 607.  Given that the
7   Ninth Circuit has held that a class of 40 people alone is sufficient to meet the
8   numerosity requirement, and the presence of other factors suggesting the desirability
9   of the class action mechanism to resolve these claims, the Court concludes that the
10  numerosity requirement here is satisfied.

11  **b. Commonality**

12  A plaintiff can meet the commonality requirement if "there are questions of law
13  or fact common to the class." Fed. R. Civ. P. 23(a)(2).  This requirement "has been
14  construed permissively." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir.
15  1998). "All questions of fact and law need not be common to satisfy the rule.  The
16  existence of shared legal issues with divergent factual predicates is sufficient, as is a
17  common core of salient facts coupled with disparate legal remedies within the class."
18  Id.  The purpose of this requirement is simply to ensure that the claims of individual
19  class members share a common core of facts "'sufficiently parallel to insure a
20  vigorous and full presentation of all claims for relief.'" Cal. Rural Legal Assistance,
21  Inc. v. Legal Servs. Corp., 917 F.2d 1171, 1175 (9th Cir. 1990) (citation omitted).

22  Here, Plaintiffs set forth several common questions of law among the
23  proposed subclasses: (1) whether Defendants' policies mischaracterized store
24  managers as exempt employees under California law; (2) whether Defendants'
25  policies and practices unlawfully deprived store managers of overtime compensation;
26  (3) whether Defendants employed policies and practices to avoid providing meal and
27  rest periods (or compensation thereof) for all employees; and (4) whether Defendants'
28  policies and practices constituted a violation of California Business & Professions

1   Code § 17200 et seq. (Mot. at 7-8.)  In addition, Plaintiffs contend there are common

2   questions of fact as Defendants employed a standard set of policies and procedures

3   for their employees throughout all their restaurants.

4        Defendants attempt to defeat the commonality requirement by arguing that

5   Plaintiffs' own deposition testimony suggests that they did not comply with

6   Defendants' uniform policies and thus share no common issues with other members

7   of the proposed subclasses.  For instance, Defendant contends Alba testified he did

8   not use Defendants' computer system to determine scheduling, projected sales, or

9   required inventory. (See Imara Decl., Ex. 1 [Alba Dep.] 100:18-102:2, 151:11-19.)

10  However, the cited testimony is in some respects ambiguous and is taken out of

11  context.  For example, Alba acknowledged that he was provided with a profit and loss

12  statement prepared centrally.  (Id. at 102:11-22.)  Alba also testified that he used the

13  computer system on several occasions for time keeping, scheduling, and making daily

14  reports.  (See, e.g., Bailey Decl., Ex. J [Alba Dep.] 41:4-9, 74:13-15, 98:17-19, 98:21-

15  22, 131:22-132:5.)  Thus, Defendants' have mischaracterized Alba's deposition

16  testimony on this topic.

17       Defendants also argue that Elysian testified he could not identify the meal and

18  rest break policy he alleges pertained to him.  (See Imara Decl., Ex. 2 [Elysian Dep.]

19  151:10-153:7.)  However, a closer look at this testimony reveals not that Elysian could

20  not identify the policy, but that he was unsure whether the term "policy" was a proper

21  word to describe Defendants' practice regarding meal and rest periods.  (See id. at

22  152:13-14 ("I'm not sure whether you term it policy – that's a legal term.  I'm not legal

23  expert [sic].").)  Thus, though Defendants attempt to depict Plaintiffs as not having any

24  common questions of law or fact with the proposed subclasses, their arguments fail.

25  Because Defendants do not otherwise refute Plaintiffs' assertions that common

26  questions of law or fact do exist, the commonality requirement is satisfied.

27  //

28  //

### c. Typicality

Typicality exists when "the claims or defenses of the representative are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are **reasonably co-extensive** with those of absent class members; **they need not be substantially identical**." Hanlon, 150 F.3d at 1020 (emphases added).  To make this assessment, the Court looks to "'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" Hanon, 976 F.2d at 508 (quoting Schwartz v. Harp, 108 F.R.D. 279, 282 (C.D. Cal. 1985)).  In other words, "the test is that the class representative 'must be part of the class and possess the same interest and suffer the same injury as the class members.'" Haley, 169 F.R.D. at 649 (citations omitted).

Here, Alba declares that due to Defendants' classification of his job as "exempt," he did not receive overtime compensation or meal and rest breaks.  (Alba Decl. ¶ 2.)  Because he seeks to represent a class of store managers who also did not receive overtime compensation or meal and rest breaks due to Defendants' classification of them as "exempt," Alba meets the typicality requirement.  Similarly, Elysian declares that he was subject to Defendants' uniform policy regarding meal and rest breaks.  (Elysian Decl. ¶ 3.)  Thus, his claims as to whether Defendants' policy complies with California law are typical of the claims of other employees subject to the same policies.

Defendants argue that typicality is not met because Alba and Elysian have testified to the effect that they do not share the same interests as members of the proposed subclasses.  First, Defendants argue Alba testified that he did not use a computer program and also performed exempt tasks, unlike the members of proposed Subclass A.  (Opp. at 10-11.)  The Court has already addressed his testimony regarding use of the computer system.  As to "management tasks," Alba

1    admitted during deposition that on occasion he performed managerial tasks, such as

2    hiring and firing, disciplining, and training, but he never stated that the majority of his

3    work time was spent performing those tasks (which is a requirement for exempt status

4    pursuant to Cal. Code Regs. tit. 8, § 11070(1)(A)(1)). (See, e.g., Imara Decl., Ex. 1

5    [Alba Dep.] 59:23-60:17, 93:16-24, 94:25-95:6, 95:12-13.) Thus, his statements do

6    not contradict the claims of other store managers, namely that they were wrongly

7    classified as "exempt" employees, and thus denied overtime compensation and meal

8    and rest breaks.

9        In addition, Defendants argue that Elysian's claims are not typical of proposed

10   Subclass B because he worked day shifts of 6 to 8 hours, whereas the majority of

11   employees he seeks to represent worked night shifts of only 3 to 4 hours. (Opp. at

12   11-12.) However, to satisfy the typicality requirement, not all job categories need be

13   represented. See Staton, 327 F.3d at 957 (each job category does not need a class

14   representative for each claim alleged to satisfy typicality requirement). Thus, the fact

15   that Elysian may have worked the day shift, as opposed to the night shift, and worked

16   a few more hours per shift than others does not negate the common contention that

17   all of Defendants' delivery drivers were subject to, and disadvantaged by, Defendants'

18   written policies regarding meal and rest periods.

19       Thus, as Defendants' arguments to refute the typicality requirement fail, the

20   Court concludes that Alba's and Elysian's claims are typical of the subclasses they

21   seek to represent.

22       **d. Adequacy**

23       To satisfy the requirement of adequacy, Plaintiffs must establish (1) that they

24   do not have conflicts of interest with the proposed subclasses; and (2) that they are

25   represented by qualified counsel. Hanlon, 150 F.3d at 1020 (citations omitted); see

26   also Haley, 169 F.R.D. at 649-50. The purpose of this requirement is to protect the

27   due process interests of absent class members who "must be afforded adequate

28

14

1 | representation before entry of a judgment which binds them." <u>Wang</u>, 231 F.R.D. at
2 | 609.

3 |      Here, Alba and Elysian contend that they do not have any conflicts of interest
4 | with any members of the proposed subclasses. (Alba Decl. ¶ 15; Elysian Decl. ¶ 6.)
5 | Defendants do not dispute these contentions, but argue that credibility issues hinder
6 | Alba and Elysian from adequately representing the proposed subclasses. <u>See Kline</u>
7 | <u>v. Wolf</u>, 702 F.2d 400, 403 (2d Cir. 1983) (affirming district court ruling that proposed
8 | class representatives were not adequate because their testimony on critical issue to
9 | cause of action was sharply attacked, and thus they lacked credibility in general).
10 | Defendants argue that Alba contradicts his deposition testimony with his declaration
11 | submitted in support of this motion. In his declaration, he states that he used
12 | Defendants' "Profit System" and was required to comply with the policies listed in
13 | Defendants' Operations Manual. (Alba Decl. ¶¶ 9-10.) However, Defendants note
14 | that in Alba's deposition testimony, he stated that he did not know what the "Profit
15 | System" was (Imara Decl., Ex. 1 [Alba Dep.] 156:16-157:3), and that the Operation
16 | Manual for his store had not been ordered from the franchisor. (<u>Id.</u> at 157:25-158:9.)

17 |      As to the "Profit System," a close examination of the deposition transcript
18 | reveals that the questioning attorney was asking about the "Profit System" (name
19 | given to the computer system), not the actual computer system. (<u>Id.</u> at 156:16-157:3.)
20 | In fact, as explained above, Alba testified several times to using the computer system
21 | for his restaurant. (<u>See</u> Bailey Decl., Ex. J [Alba Dep.] 41:4-9, 74:13-15, 98:17-19,
22 | 98:21-22, 131:22-132:5.) Though Alba may not have known or remembered the
23 | name of the computer system, he testified that he used it on a regular basis. Thus,
24 | Defendants cannot impeach his credibility on this ground. Likewise, though Alba
25 | testified that the Operations Manual was never ordered for his restaurant, he does not
26 | testify that he had never read the Manual or had never received training or the
27 | procedures described in the Manual. (<u>See</u> Imara Decl., Ex. 1 [Alba Dep.] 157:25-
28 | 158:9.) His declaration that he learned the policies and procedures outlined in the

1    Operations Manual through managerial training, which included the Management

2    Training Program manual (Alba Decl. ¶ 10), does not contradict his deposition

3    testimony.  Thus, this argument also does not impeach Alba.

4         Defendants also attack the credibility of both Alba and Elysian by arguing that

5    they do not understand the case and their roles in the litigation.  During deposition,

6    Alba testified that he did not understand how much the costs of litigation would be or

7    what his role is in making decisions in this lawsuit.  (See Imara Decl., Ex. 1 [Alba

8    Dep.] 21:20-22:8, 25:1-26:1, 45:19-46:3, 57:20-25, 118:1-119:1.)  Additionally, Elysian

9    testified that he did not know the costs and fees associated with this litigation and that

10   he did not know how experienced his attorneys were.  (Id., Ex. 2 [Elysian Dep.] 60:25-

11   62:22, 94:18-95:9.)  Defendants conclude that Plaintiffs' lack of knowledge here

12   precludes them from being "adequate representatives" of their proposed classes.

13        However, even if Alba and Elysian do not understand the legal issues involved

14   in their case, Defendants have not demonstrated that they lack knowledge regarding

15   the *facts* of their case.  The adequacy of a putative class representative does not

16   depend on his legal knowledge or on whether he knows all the facts about the class

17   as a whole.  See McCall v. Drive Fin. Servs., L.P., 236 F.R.D. 246, 253 (E.D. Pa.

18   2006) (citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 366 (1966)).  Accordingly,

19   any attacks on Alba's and Elysian's credibility on the grounds of their lack of legal

20   knowledge is unavailing.

21        As to the adequacy of counsel, Plaintiffs' counsel state that they have

22   substantial experience in class action litigation, such as class certification, complexity,

23   and the expense of maintaining class action litigation, and list several actions which

24   they have successfully litigated or are currently litigating. (Kellner Decl. ¶¶ 1-5;

25   Khorrami Decl. ¶¶ 12-17.) Defendant raises no argument with respect to the

26   adequacy of counsel or conflicts of interest.  The Court thus concludes Plaintiffs and

27   their counsel have demonstrated that they will adequately represent the classes.

28

1    In sum, Rule 23(a) is satisfied because Plaintiffs meet all four requirements of

2    numerosity, commonality, typicality, and adequacy.

3    **3. THE REQUIREMENTS OF RULE 23(B)(3)**

4    In addition to satisfying the requirements of Rule 23(a), a party seeking

5    certification must also demonstrate that the proposed class meets one of the

6    requirements of Rule 23(b). Zinser, 253 F.3d at 1186. In this case, Plaintiff seeks to

7    satisfy Rule 23(b)(3). "[C]ertification pursuant to Rule 23(b)(3) . . . is appropriate

8    'whenever the actual interests of the parties can be served best by settling their

9    differences in a single action.'" Hanlon, 150 F.3d at 1022 (citation omitted).

10    Before certifying a class under this subsection, a court must determine that

11    "the questions of law or fact common to the members of the class predominate over

12    any questions affecting only individual members, and that a class action is superior to

13    other available methods for the fair and efficient adjudication of the controversy."

14    Fed. R. Civ. P. 23(b)(3). These questions are interrelated because "[i]mplicit in the

15    satisfaction of the predominance test is the notion that the adjudication of common

16    issues will help achieve judicial economy." Valentino, 97 F.3d at 1234; Haley, 169

17    F.R.D. at 650.

18    **a. Predominance**

19    The predominance requirement is "far more demanding" than the commonality

20    requirement of Rule 23(a). Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24

21    (1997). However, "[w]hen common questions present a significant aspect of the case

22    and they can be resolved for all members of the class in a single adjudication, there is

23    clear justification for handling the dispute on a representative rather than on an

24    individual basis." Hanlon, 150 F.3d at 1022.

25    Thus, "some variation among the individual employees, as well as some

26    potential difficulty in proof" – including as to damages – do not defeat predominance.

27    Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244

28    F.3d 1152, 1163 (9th Cir. 2001) ("Las Vegas Sands"); see also Bell v. Farmers Ins.

17

1 | *Exchange*, 115 Cal. App. 4th 715, 742-43 (Ct. App. 2004). Moreover, because the
2 | focus of the inquiry is on Defendant's conduct, the fact that the determination of
3 | whether an overtime exemption applies to an employee may be a fact-intensive
4 | inquiry likewise does not defeat predominance. See, e.g., Scholtisek v. Eldre Corp.,
5 | 229 F.R.D. 381, 392-93 (W.D.N.Y. 2005); McLaughlin v. Liberty Mut. Ins. Co., 224
6 | F.R.D. 304, 310-11 (D. Mass. 2004).

### *i. Proposed Subclass A - Store Managers*

8 | First, as to the proposed Subclass A, Plaintiffs contend that common
9 | questions of law predominate because Defendants improperly classified their store
10 | managers as "exempt" employees, and thus prevented store managers from receiving
11 | overtime compensation and meal or rest breaks. Under California law, because the
12 | assertion of an exemption from California's labor laws regarding overtime and meal
13 | and rest periods is an affirmative defense, the employer bears the burden of proving
14 | an employee's exemption. Ramirez, 20 Cal. 4th at 794-95. An "executive" employee
15 | is properly classified as exempt if all six elements as provided in Cal. Code Regs. tit.
16 | 8, § 11070(1)(A)(1) are met. Plaintiffs contend Defendants cannot establish two of
17 | these elements: (1) store managers do not customarily and regularly exercise
18 | discretion and independent judgment; and (2) they are not primarily engaged in
19 | exempt-type work (i.e., do not spend more than one-half of their time doing exempt-
20 | type work). Thus, Plaintiffs present evidence that undermine Defendants' blanket
21 | assertion that store managers were exempt as a class. This alone suggests the
22 | predominance of common questions of law and fact.

23 | Plaintiffs also assert that common factual questions predominate because of
24 | Defendants' standardized policies and practices to operate each of their stores.
25 | These policies include Defendants' hierarchical management structure, where area
26 | supervisors would oversee the operation of each restaurant and would receive "daily
27 | reports" from store managers. In addition, Defendants' Operations Manual was used
28 | throughout each of their California stores and governed how each Papa John's

1    restaurant should be run.  It also contained a daily checklist for managers to ensure

2    they were meeting all their responsibilities in operating their respective restaurants.

3          Plaintiffs observe that to implement these standardized operational

4    procedures, Defendants used a uniform training program for all their employees in

5    their California stores.  Defendants also had a "deployment" policy in the Operations

6    Manual, which governed what duties an employee had depending on the number of

7    employees working at the time.  Specifically, the manual provided that "[t]here are

8    several hours during an operational day when projected products require only one in-

9    store team member.  During this time, the manager in charge is the in-store team."

10    (Khorrami Decl., Ex. G [Deployment Section].)

11          Furthermore, Defendants employed the "Profit System," a computer system at

12    each store that facilitated management functions and increase efficiency.  Finally,

13    Defendants employed a strict "labor goal" policy, which limited the cost of labor to the

14    minimum necessary to operate each store.  This policy was set by the Director of

15    Operations, and each store manager was required to submit the employee schedule

16    weekly to his or her area supervisor to ensure that the goals were met.  In sum,

17    Plaintiffs contend that these various standardized policies and practices used by

18    Defendants prevented store managers from exercising discretion and/or independent

19    judgment.  They also contend that they were required to spend their time primarily on

20    non-managerial tasks.  Thus, Plaintiffs argue that as a result of this standardization,

21    common issues of both law and fact predominate over individual issues.

22          Several cases considering an employer's standardized policies and practices

23    have held that common questions predominated. See, e.g., Tierno v. Rite Aid Corp.,

24    No. C 05-02520 TEH, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) (common

25    questions predominated due to defendant's standardized policies throughout its

26    stores); Wang, 231 F.R.D. at 614 ("courts recognize that employer practices and

27    policies with regard to wages and hours often have an impact on large numbers of

28    workers in ways that are sufficiently similar to make class-based resolution

1   appropriate and efficient"); cf. Sav-On Drug Stores, Inc. v. Superior Court, 34 Cal. 4th

2   319, 329 (2004) (class certification appropriate in case where record contained

3   "substantial evidence that, owing in part to operational standardization . . .

4   classification based on job descriptions alone resulted in widespread de facto

5   misclassification").

6           One case is particularly instructive.  In Tierno, plaintiff sought to represent

7   store managers of a national drugstore chain, alleging that they did not spend more

8   than 50 percent of their time on discretionary management functions, and thus were

9   not "exempt" management employees under California law.  Tierno, 2006 WL

10  2535056, at *1.  Plaintiff introduced several pieces of evidence demonstrating that

11  Rite Aid exercised a great deal of centralized control over its stores with uniform

12  policies covering every aspect of store operations.  Id. at *5.  Plaintiffs also introduced

13  evidence that Rite Aid imposed a uniform training program implemented in each of its

14  stores.  Id. at *5-6.  Moreover, plaintiffs introduced evidence that store managers'

15  tasks were essentially the same, with some variation depending on store size and

16  location.  Id. at *6.  No matter which location, store managers were expected to follow

17  the same policies and procedures, which included complying with a checklist of daily

18  tasks.  Id.  Furthermore, plaintiffs introduced evidence that store managers were

19  closely supervised by district managers to maintain homogeneity in the store

20  manager's job duties.  Id. at *7.  The court concluded that this evidence of

21  standardized policies and practices demonstrated that common questions

22  predominated.  Id.

23          This case presents a fact pattern remarkably similar to Tierno, as both cases

24  involve a substantial amount of standardized policies and practices used by the

25  defendants.

26          In response, Defendants first argue that the job description of a store manager

27  describes the job as an exempt position, such as managing the restaurant, hiring and

28  firing, ensuring customer service, and evaluating profits and losses.  (Williams Decl.,

1    Ex. 1 [General Manager Job Description].)  However, the job description itself cannot

2    replace what the store manager *actually* does.  See Ramirez, 20 Cal. 4th at 802

3    (improper to focus solely on job description, as "employer could make an employee

4    exempt from overtime laws solely by fashioning an idealized job description that had

5    little basis in reality").

6          Defendants also argue that whether store managers can be considered

7    "exempt" requires an inquiry into the individual circumstances of each store manager

8    and cite Jimenez v. Domino's Pizza, 238 F.R.D. 241 (C.D. Cal. 2006), which denied

9    class certification in another pizza restaurant case.  In Jimenez, plaintiffs sought to

10   represent a group of general managers, who claimed that Domino's had failed to pay

11   them overtime wages and failed to provide meal and rest periods.  Id. at 246.  The

12   court denied class certification, holding that plaintiffs did not satisfy Rule 23(b)(3)

13   because individual issues predominated.  Id. at 251.  Specifically, the court noted that

14   the issue in its case was how much time the general managers spent on their various

15   exempt and non-exempt tasks.  Id.  The court held that "to determine which

16   employees are entitled to overtime because of improper classification is an 'individual

17   fact-specific analysis' of each general manager's performance of the managerial and

18   non-managerial tasks."  Id.

19         However, though Jimenez initially appears analogous to the facts of this case,

20   Jimenez is easily distinguished.  The court in Jimenez was not confronted with an

21   organization that operated through standardized policies implemented by a

22   centralized authority.  See Jimenez, 238 F.R.D. at 251-53.  Jimenez contains no

23   discussion of the existence of, or not, of tight centralized control or standardized

24   policies and practices of Domino's.  If Domino's did not exert centralized management

25   over its pizzerias, then its managers would likely have a greater amount of discretion

26   in performing their duties, and this discretion could arguably differ from store to store.

27   Here, however, Defendants' policies as presented to the Court demonstrate

28   Defendants' centralized system to maintain uniformity throughout each restaurant.  By

1   delineating tasks that each store manager was to perform daily, the policies act as an

2   indicator of how much time store managers had to spend on performing both exempt

3   and non-exempt type work.  Even Defendants, in their attempt to demonstrate that

4   store managers performed exempt-type work, admit that they used standardized

5   policies for exempt-type duties, such as employee training, orientation and discipline,

6   and developing positive relations with community organizations.  (Green Decl. ¶¶ 5-6.)

7   This also tends to establish a uniformity throughout each of Defendants' stores, and

8   thereby does not require extensive individualized inquiries into each store manager's

9   circumstances.

10          Furthermore, the question whether store managers are "exempt" is a common

11   defense for Defendants in this case, which supports class adjudication.  See Romero

12   v. Producers Dairy Foods, Inc., 235 F.R.D. 474, 490 (E.D. Cal. 2006).  Though

13   Jimenez distinguishes Romero by contending that the common defense of non-

14   exemption in its case is based on facts that vary from employee to employee, and

15   thus individual inquiries predominate, Jimenez, 238 F.R.D. at 252-53, Defendants

16   cannot deny their own classification of all their store managers as "exempt."

17   (Khorrami Decl., Ex. B [Response to Interrogatory No. 3.)  "Defendant[s] cannot, on

18   the one hand, argue that all [its store managers] are exempt from overtime wages,

19   and, on the other hand, argue that the Court must inquire into the job duties of each

20   [store manager] in order to determine whether that individual is 'exempt.'"  Wang, 231

21   F.R.D. at 613; see also Tierno, 2006 WL 2535056, at *9 (defendant's contention that

22   each store manager position must be individually assessed to determine whether

23   position is exempt or non-exempt after initially classifying all store managers as

24   exempt "rings hollow").

25          And even if individual class members may have had differences between

26   them – such as the amount of overtime pay owed or the number of missed rest

27   periods – these differences affect damages, not Defendants' liability.  Id.  But it is well

28

22

1   established that even where the amount of damages must be individually determined,

2   that "does not defeat class action treatment." Blackie, 524 F.2d at 905.

3          Thus, even though Defendants claim that individual inquiries into the

4   circumstances of each store manager are necessary here, the questions whether

5   store managers are properly classified as "exempt" and whether the standardized

6   policies and practices throughout Defendants' stores prevent store managers from

7   meeting the definition of "exempt" are common questions that are more appropriately

8   addressed on a class-wide basis.

9                    ***ii. Proposed Subclass B - Non-Exempt Hourly Employees***

10          With respect to the non-exempt employees, Plaintiffs contend that common

11   questions predominate over whether Defendants did not provide meal and rest

12   periods as required by California law.  They are correct.

13          As noted above, Defendants' Team Member Handbook outlined Defendants'

14   policy with regard to meal and rest breaks.  It provides:

15          Unless otherwise required by state or county laws, team members who
            work eight or more hours in a single shift are entitled to a 30-minute
16          unpaid meal break near the middle of that shift.  Team members
            working more than four hours may take a paid 10-minute break, as
17          work allows, in the morning and in the afternoon.

18   (Khorrami Decl., Ex. E [Team Member Handbook] at 46.)  Defendants admit that this

19   meal and rest period policy was the policy communicated to all their California

20   employees during the class period.  (Khorrami Decl., Ex. C [Responses to Request for

21   Admission Nos. 9-10.)  Store managers declare that hourly employees who worked

22   less than eight hours rarely, if ever, received an off-duty meal break that was 30

23   minutes in duration.  (Alba Decl. ¶ 13; Byrd Decl. ¶ 13; Jalal Decl. ¶ 13 Lester Decl. ¶

24   13 Olamiti Decl. ¶ 13.)  In addition, Elysian declares that as an hourly employee, he

25   rarely received an off-duty rest break.  (Elysian Decl. ¶ 4.)

26          In response, Defendants contend that this policy does not violate California

27   law because the Handbook was distributed to their stores nationwide.  The policy

28   contained an introductory clause, which stated the policy applied "[u]nless otherwise

1     required by state or county laws." (Khorrami Decl., Ex. E [Team Member Handbook]

2     at 46.)  Accordingly, Defendants contend that pursuant to California law, the California

3     store managers were trained to provide a 30-minute off-duty meal period for all non-

4     exempt employees working shifts of five hours or more. (Green Decl. ¶¶ 19-20; Kerr

5     Decl. ¶¶ 12-13; Williams Decl. ¶ 10, Exs. 8 & 9 [Emails to Area Supervisor and

6     Operating Partner Detailing California Law Regarding Meal and Rest Periods].)

7             However, whether or not Defendants employed a policy of not providing meal

8     and rest breaks as required by California law goes to the **merits** of the case, not to

9     whether common issues predominate, which is the issue that the Court must examine

10    on a motion for class certification.  See Eisen, 417 U.S. at 177-78; Staton, 327 F.3d at

11    954.  In fact, Defendants concede that they had a policy regarding meal and rest

12    breaks for all their California stores.  Whether the policy satisfies the right to meal and

13    rest periods under California law is a question of law not only common to the

14    proposed subclass, but also one that predominates over individual factual questions

15    that may arise.  That is, the Court will be called upon to examine Defendants' meal

16    and break policies themselves for compliance with the law.

17            Defendants also note that Plaintiffs provide only the declaration of Elysian to

18    demonstrate that non-exempt hourly employees did not receive their meal and rest

19    breaks, and thus argue that this can only be an individualized inquiry that should not

20    be decided on a class-wide basis.  However, Defendants cite no authority for this

21    proposition.  In addition, Defendants admit that the meal and rest break policy applied

22    to all their non-exempt hourly employees.  Thus, though Plaintiffs only submit one

23    declaration contending an unlawful meal and rest break policy, that does not mean

24    there are no other similarly situated persons subject to the same policy and who were

25    not provided with their meal and rest breaks.

26            Thus, the question whether non-exempt hourly employees were subject to a

27    policy of meal and rest periods that violated California law is a common question

28    predominating over individual issues.

1

**b. Superiority**

2      After determining that common questions of law or fact predominate, the

3  plaintiff must also demonstrate that "a class action is superior to other available

4  methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P.

5  23(b)(3).  To determine whether there are sufficient questions common to all

6  prospective plaintiffs that having class action treatment would be more efficient than

7  having a number of separate trials, the Court considers the factors set forth in Rule

8  23(b)(3), among others. Amchem Prods., 521 U.S. at 616; Zinser, 253 F.3d at 1190.

9      Typically, a class action is superior if the case presents a large volume of

10  individual claims that could strain judicial resources if tried separately and if each

11  potential plaintiff's recovery may not justify the cost of individual litigation. See

12  Amchem Prods., 521 U.S. at 616-17; Phillips Petroleum Co. v. Shutts, 472 U.S. 797,

13  809 (1985); Las Vegas Sands, 244 F.3d at 1163.  As to the four factors explicitly set

14  out in Rule 23(b), each factor weighs in favor of class certification.

15      The first factor is "the interest of members of the class in individually

16  controlling the prosecution and defense of separate actions." Fed. R. Civ. P.

17  23(b)(3)(A).  "This factor is most relevant where each class member has suffered

18  sizeable damages or has an emotional stake in the litigation." Zinser, 253 F.3d at

19  1190.  Likewise, "[w]here damages suffered by each putative class member are not

20  large, this factor weighs in favor of certifying a class action." Id.; Haley, 169 F.R.D. at

21  652.  Defendants note that five store managers had previously pursued their own

22  overtime claims before the California Labor Commissioner. (See Defs.' RJN Exs. 1-5

23  [California Department of Labor Standard Enforcement Complaints and Decisions].)

24  In each case, the Labor Commissioner concluded that the store managers were

25  properly classified as exempt. (Id.)  Defendants thus argue that this prior litigation

26  supports the superiority of individualized litigation.  However, just because individual

27  claims have been pursued in the past does not mean that this method is superior.

28  The facts and ultimate decisions in these cases were virtually identical.  Moreover, in

1    each hearing, Defendants put on the same witnesses – two current store managers,

2    one area supervisor, and the operating partner – to testify to each plaintiff's

3    management duties, work activities, and management responsibilities. (See id.)

4    Based on the judgments rendered in these five actions, Defendants' witnesses

5    provided identical testimony in each case. (See id.) This suggests that consolidating

6    the action into one proceeding rather than requiring individualized inquiries would

7    better serve judicial economy.  Thus, this factor weighs in favor of finding that a class

8    action is superior.

9         The second factor is "the extent and nature of any litigation concerning the

10   controversy already commenced by or against members of the class." Fed. R. Civ. P.

11   23(b)(3)(B).  The record does not contain any information about other pending

12   lawsuits that might need to be enjoined, and this factor therefore also weighs in favor

13   of class certification.

14        The third factor is "the desirability or undesirability of concentrating the

15   litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C).

16   Defendants sold their California restaurants in May 2005 and no longer do business in

17   California.  However, because all members of the proposed subclasses worked in

18   southern California restaurants, and there is no evidence in the record indicating that

19   a substantial number of these employees have left the forum, the present forum is

20   preferable.  Thus, this factor also weighs in favor of class certification.

21        The fourth factor addresses "the difficulties likely to be encountered in the

22   management of a class action." Fed. R. Civ. P. 23(b)(3)(D).  Again, neither party

23   raises any specific additional arguments to fit into this category, separately from

24   Defendant's arguments about individual issues predominating, as discussed above.

25   Thus, this factor also favors class certification.

26        Thus, based on an evaluation of these four factors, a class action would be

27   superior to individualized litigation, and thus Rule 23(b)(3) has been satisfied.

28

1 │ Because Rule 23(a) has also been satisfied, the Court **GRANTS** Plaintiffs' motion for
2 │ class certification.

3 │     **4. CLASS COUNSEL**

4 │     Once a class is certified, the Court must appoint class counsel.  Fed. R. Civ.
5 │ P. 23(g)(1)(A).  Class counsel "must fairly and adequately represent the interests of
6 │ the class."  Fed. R. Civ. P. 23(g)(1)(B).  In appointing class counsel, the court must
7 │ consider: (1) the work counsel has done in identifying or investigating potential claims
8 │ in the action; (2) counsel's experience in handling class actions, other complex
9 │ litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the
10 │ applicable law; and (4) the resources counsel will commit to representing the class.
11 │ Fed. R. Civ. P. 23(g)(1)(C)(i).  The Court may consider "any other matter pertinent to
12 │ counsel's ability to fairly and adequately represent the interests of the class."  Fed. R.
13 │ Civ. P. 23(g)(1)(C)(ii).

14 │     Plaintiffs' counsel – The Law Offices of Shawn Khorrami and Kabateck Brown
15 │ Kellner, LLP – provide detailed declarations regarding their class action litigation
16 │ experience, knowledge of the applicable law, and their commitment to representing
17 │ the class.  Counsel has demonstrated that they have investigated potential claims in
18 │ the action by conducting extensive discovery in this matter already, as evidenced by
19 │ the exhibits and other documents provided with this motion.  They have extensive
20 │ experience with class actions, have successfully litigated class actions (including
21 │ actions involving overtime wage disputes), and have the resources and staff to
22 │ diligently manage the action and provide notice to each member of the classes in this
23 │ action.  (Kellner Decl. ¶¶ 1-5; Khorrami Decl. ¶¶ 12-17.)

24 │     Thus, Plaintiffs' counsel have demonstrated that they would "fairly and
25 │ adequately represent the interests" of the proposed subclasses.  Accordingly, the
26 │ Court **GRANTS** Plaintiffs' motion to appoint The Law Offices of Shawn Khorrami and
27 │ Kabateck Brown Kellner, LLP as class counsel.

28 │ //

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for class certification pursuant to Rule 23 and **CERTIFIES** Subclass A and Subclass B.  The Court also **GRANTS** Plaintiffs' motion to appoint their counsel as class counsel.

IT IS SO ORDERED.

DATED: February 7, 2007

Judge Gary Allen Feess
United States District Court